UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:22-cr-334 (JEB) |
| MIKHAIL SLYE | |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mikhail Slye to 57 months' incarceration, which is the middle of the guideline range—51 to 63 months—calculated by the Probation Office and agreed to by the parties, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

I.      INTRODUCTION

The defendant, Mikhail Slye, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

_____

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

1

Slye joined the violent mob storming the U.S. Capitol, travelled from the Lower West terrace to the Upper West terrace with the mob, and then entered the U.S. Capitol through a broken window near the Senate Wing Door while wearing a baseball helmet with a facemask. He exited a short time later, but then reentered the building within minutes. He travelled to the Crypt area of the building and remained inside for 30 minutes. After exiting the U.S. Capitol, Slye went to the North side of the building and joined another violent mob standing just outside of the North Doors. Slye observed that police were using chemical spray to keep the mob away from the North Doors. As a group of officers were making their way down the steps just outside those Doors, Slye grabbed a bicycle rack barricade and waited for the officers to come down the stairs. As a Capitol Police officer approached his position, Slye threw the barricade into the officer's path and caused him to trip over it. The officer suffered physical injuries as a direct result of the fall.[2] After he tripped the officer, Slye berated officers attempting to reenter the U.S. Capitol building, shouting "traitor," "this is our country," "f*** you," "Nazis," and "f***ing bitches." He also spat at the police. After being arrested, Slye admitted to entering the Capitol building twice but refused to admit that he assaulted the police officer with the barricade until he pleaded guilty to the offense of conviction.

The government recommends that the Court sentence Slye to 57 months' incarceration, which is within the advisory Guidelines' range of 51-63 months, for Slye's conviction under 18 U.S.C. § 111(a)(1). A 57-month sentence reflects the gravity of Slye's criminal conduct and takes

---

[2] Although he is an identifiable victim, Officer D.T. has elected, for reasons known only to himself, to not submit a Victim Impact Statement or participate in the sentencing process. The United States will submit Officer D.T.'s previously issued statements to the Court under seal upon filing this sentencing memorandum.

into account his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense filed in this case, ECF 29 ¶¶ 1-7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Slye's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Slye traveled to Washington, D.C. to attend the former president's "Stop the Steal" rally. ECF 29 ¶ 8. After attending the rally, Slye walked to the U.S. Capitol where a large crowd had gathered to protest Congress' certification of the Electoral College. *Id*. He was wearing a black "Trump" winter hat, a yellow gator partially covering his face at certain times, a dark navy winter jacket over the top of a gray hooded sweatshirt, blue jeans, and black gloves. *Id*.

Slye came prepared for violence. He appeared in open-source media and U.S. Capitol Police CCTV with a dark-colored baseball helmet with a metal facemask. *Id*. Images 1-3, below, are open-source photographs of Slye with the baseball helmet.



*Image 1*



*Image 2*



Capitol Riots Raw Footage _ ***Journalistic Purposes Only***

*Image 3*

When Slye arrived at the U.S. Capitol on January 6, 2021 at approximately 2:30 p.m., a large crowd had assembled on the Lower West Terrace of the grounds surrounding the Capitol building. ECF 29 ¶ 9. He observed that the building was closed to the public and police officers were actively attempting to keep the crowd from entering the building. *Id*. Slye then made his way from the Lower West Terrace to the Upper West Terrace.

Slye entered the Capitol building twice, each time through the site of the initial breach: the Senate Wing Doors. *Id*. He first entered through a broken window at approximately 2:56 p.m., stayed near the breach site, and exited through another broken window in the same area about three minutes later. *Id*. Images 4-5, below, are CCTV images of Slye's first entry and exit:



*Image 4*



*Image 5*

At 3:05 p.m., Slye reentered the building through the Senate Wing Door area. ECF 29 ¶ 9.

This time, Slye walked around the inside of the building for about 30 minutes, travelling to the

Crypt area. *Id*. He exited the building through the Senate Wing Door area at approximately 3:35

p.m. Images 6-7, below, are CCTV images of Slye's second entry and exit:



*Image 6*



*Image 7*

After exiting the building for the second time, Slye walked around the Upper West Terrace to the North side of the Capitol building, where he observed rioters clashing with the police. ECF 29 ¶ 10. Officers were periodically exiting the Capitol building and reentering through the North Doors in their efforts to control the mob of rioters. *Id*. Slye observed that the officers were using rubber bullets, fire extinguishers, and pepper spray for crowd control purposes. *Id*.

At approximately 4:14 p.m., a group of officers, including United States Capitol Police Officer D.T., exited through the North Doors and began to descend a flight of stairs to come to the aid of another officer who had been surrounded by rioters. *Id*. ¶ 11. Slye was positioned at the bottom of the stairs. *Id*. He grabbed a bicycle rack barricade and waited for the officers to come down the stairs. *Id*. As Officer D.T. reached Slye's position at the bottom of the stairs, Slye threw the barricade into Officer D.T.'s path. *Id*. Officer D.T. tripped over the barricade and suffered injuries to his right hand, shins, and a contusion to his right thumb. *Id*. Images 8-11, below, are screenshots from open-source videos[3] capturing the officer assault from different angles (Slye is outlined in yellow, and Officer D.T. is outlined in green):

---

[3] The government will submit clips of the relevant videos to the Court by USAfx prior to the sentencing hearing.



*Image 8*



*Image 9*



*Image 10*



*Image 11*

Minutes later, Slye shouted insults at police officers, including Officer D.T., while they attempted to reenter the building. ECF 29 ¶ 12. Slye yelled, "traitor," "this is our country," "f*** you," "Nazis," and "f***ing bitches" as he spat at police while they were deploying pepper spray and fire extinguishers to disperse the mob. *Id.* Image 12, below, is a screenshot from officer bodycam capturing Slye berating and spitting at them:



*Image 12*

Image 13, below, is an open-source photograph showing another person treating Slye's eyes with water after he was hit with chemical spray after his assault on Officer D.T. near the

North Doors:



*Image 13*

### *Officer D.T.'s Statements to the FBI*

Officer D.T. was interviewed by the FBI on August 16, 2021. He recalled that two officers were stranded and surrounded by rioters on the North side of the Capitol near the North Doors. Officer D.T. and other officers responded to the call for assistance and exited the building through the North Doors. Officer D.T. recalled being struck by a bike rack barricade as he descended the stairs leading to the North Doors. He sustained about five cuts to both of his shins, four on his left shin and one on his right shin. His shins were also bruised. He had blood on the inside of his pants and socks. When he fell after being struck with the bike rack, Officer D.T. used his right hand to brace himself as he hit the ground. He sustained a contusion from the bottom of his right thumb to the center of his right palm.

Officer D.T. could not move his right thumb to touch any other fingers other than his index

finger for about two days. It was not until March 2021 that his shin injuries fully healed and the pain in his right hand was gone. Officer D.T. recalled rioters yelling "traitor," the "n-word," "f*ck you," "you're on the wrong side," and "coon" at him. He believed these racial epithets were directed at him specifically because he was the only 'ethnic' officer exiting the Capitol at that time. Officer D.T. has suffered lasting psychological injuries from the riot. He was unable to sleep without the aid of medicine and being near large crowds triggers memories of the January 6th riot.

### *Slye's Statements to the FBI*

On September 30, 2022, Slye was interviewed following his arrest by the FBI. Slye admitted that he attended the rally in Washington, D.C. on January 6, 2021 and then walked down to the Capitol Building. He went to the rally because he believed the election was stolen. He declined to answer if he went to the rally alone. He said that someone handed him the helmet that he was wearing and they also tried to give him a bat, which he did not take. He admitted to entering the Capitol building and left the Capitol after he received a text message from the former President telling him to go home.

Slye denied trying to hurt anybody during the riot. He claimed to not remember throwing the bike rack. He was shown several video clips showing him at the Capitol on January 6 and admitted that he appeared in those videos. When shown a video that showed Slye throwing the bicycle rack, he claimed the barricade might have been thrown towards him, and he put his hands up to stop the barricade from hitting him, causing to rebound towards the officers. He claimed he did not remember an officer tripping over the bicycle rack.   But when asked directly if he intended to push the barricade to injure the officer, Slye answered, "I don't know, man."

14

Investigators have not conducted any other interviews of Slye. The government is unaware of any statements made by Slye on social media regarding the Capitol riot.

## III.   THE CHARGES AND PLEA AGREEMENT

On November 9, 2022, a single-count criminal Superseding Information was filed charging Slye with assaulting, resisting, or impeding certain officers in violation of 18 U.S.C. § 111(a)(1). On January 3, 2023, Slye pleaded guilty to that Superseding Information pursuant to a plea agreement.

## IV.   STATUTORY PENALTIES

Slye now faces sentencing on a single count of violating 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Slye faces up to eight years' imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The Probation Office calculated the combined offense level of the count of conviction as 24, as set forth below.

Count One: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3) | Bodily Injury | +3 |
| U.S.S.G. § 3A1.2 | Official Victim | +6 |
| **Total Offense Level:** | | **27** |

15

| Acceptance of responsibility (U.S.S.G. §3E1.1) | -3 |
|---|---|
| **Adjusted Offense Level:** | **24** |

*See* Plea Agreement at ¶¶ 5(A).

The U.S. Probation Office calculated Slye's criminal history as category I, which the government does not dispute. PSR ¶ 48. Accordingly, based on the government's calculation of Slye's total adjusted offense level of 24 after acceptance of responsibility, Slye's Guidelines imprisonment range is 51 to 63 months. PSR ¶ 89.

Slye's plea agreement contains an agreed-upon Guidelines range calculation that mirrors Probation's calculations. ECF 28 at 2-4.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Slye's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Slye's offense[s] were of the utmost seriousness, and fully support the government's recommended sentence of 57 months' incarceration.

### B.  Slye's History and Characteristics

Slye is currently a self-employed pig farmer. PSR ¶¶ 76-77. Slye has some criminal history

between the ages of 18 to 21, which includes:

- In 2008, at age 18, Slye was convicted of possession of marijuana and sentenced to one year in jail. PSR ¶ 45.

- In 2010, Slye pleaded guilty to burglary of a residence and was sentenced to 5 years' deferred community supervision.   Slye and another person attempted to break into the residence while wearing bandanas over their faces. They threw a rock through a window of the home. Officers responded and Slye and the other subject fled in a Ford Mustang that Slye drove at more than 110 miles per hour until they reached the end of a roadway and were arrested. PSR ¶ 46.

- In 2011, Slye was convicted of failure to identify himself and assessed a fine. He gave an officer a fictitious name after a traffic stop. PSR ¶ 47.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a significant sentence of incarceration. Slye assaulted and injured a federal officer with a dangerous weapon while that officer was attempting to carry out his duties by aiding a fellow officer who had become stranded and surrounded by a large mob on January 6, 2021. Before the assault, Slye entered the Capitol building through a broken window while wearing a baseball helmet with a facemask. After exiting minutes later, he reentered the building again and stayed inside for 30 minutes. After the assault, Slye berated police officers while they were attempting to reenter and secure an entrance to the Capitol building. His belligerent criminal conduct on January 6, 2021 was the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Slye was the antithesis of a peaceful protestor on January 6, 2021. He joined a violent mob that breached the Capitol building. He was expecting a violent clash with police, as evidenced by the helmet with a facemask he wore both times he entered the building. He then assaulted and injured a federal officer by throwing a barricade in his path as that officer was descending steps to aid another officer. He then berated officers, including the one he injured, by shouting, "traitor," "this is our country," "f*** you," "Nazis," and "f***ing bitches."   Slye then spat at the officers.

To date, Slye has made no statements expressing remorse for his actions.

**E.      The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being

asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5]

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[6]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *U.S. v. Daniel Caldwell*, 1:21-cr-181 (CKK), the defendant was sentenced to 68 months imprisonment after pleading guilty to violating 18 U.S.C. §§ 111(a)(1) and (b). The defendant armed himself with bear spray, outfitted himself with glasses that could protect himself from some of the effects of pepper spray, and brought a handheld two-way radio that could send and/or receive communications during the riot. After spraying a line of officers protecting the lower West terrace plaza area, he made his way up to the Capitol building and entered through the Senate Wing Door. During the riot, Caldwell taunted police officers by asking them to spray, and asking if they were "scared." Like Caldwell, Slye prepared himself for violence by wearing a helmet with a facemask. He also taunted and assaulted police. Caldwell's guideline range was higher than Slye's because

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

he pleaded guilty to § 111(a)(1) and (b), rather than just § 111(a)(1). Here, the government is recommending a middle of the range guideline sentence of 57 months' imprisonment for Slye.

Other Judges in this District have imposed middle of the guideline sentences in January 6 officer assault cases. Cody Mattice and James Mault both pleaded guilty to 18 U.S.C. § 111(a) and were sentenced to 44 months incarceration based on a Sentencing Guidelines Range of 37 to 46 months. *See U.S. v. Mattice, et al*., 21-cr-657 (BAH).

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[7] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1). Although D.T. is an identifiable victim under 18 U.S.C. § 3663A(b)(2), D.T. has not elected to submit a Victim Impact Statement or participate in the sentencing process.

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Slye must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Slye played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Slye's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 115.

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months' incarceration, which is the middle of the guideline range calculated by the Probation Office, 3 years of supervised release, $2,000 restitution, and a mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: */s/ Andrew J. Tessman*
    ANDREW J. TESSMAN
    Assistant United States Attorney
    District of Columbia – Detailee
    West Virginia Bar No. 13734
    300 Virginia Street
    Charleston, WV 25301
    (304) 345-2200
    Andrew.Tessman@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 2nd day of June, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<div style="margin-left: 40%;">

By:    */s/ Andrew J. Tessman*
  ANDREW J. TESSMAN
Assistant United States Attorney
District of Columbia – Detailee
West Virginia Bar No. 13734
300 Virginia Street
Charleston, WV 25301
(304) 345-2200
Andrew.Tessman@usdoj.gov

</div>